UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK GALLOWAY,<br><br>Defendant. | Case No. 2:20-mj-01041-EJY<br><br>**ORDER** |

This Order arises from Defendant Mark Galloway's ("Galloway") Motion to Suppress in which he argues that Lake Mead National Recreation law enforcement Rangers Romine and Fitch (the "Rangers") lacked probable cause to arrest him and subsequently search his car. ECF No. 17 at 1. Galloway also contends that he did not voluntarily consent to a field sobriety test. *Id*. The Court has considered Galloway's Motion, the Government's Response (ECF No. 22), and Galloway's Reply (ECF No. 26). The Court also considered supplemental briefing at ECF Nos. 39 and 40. The Court held evidentiary hearings on June 16 and 23, 2021, and has considered all testimony given and arguments made.

**I.     Background**

On December 6, 2020, at approximately 9:34 p.m., Lake Mead Interagency Dispatch Center ("Dispatch") 911 Dispatcher Christina Votipka ("Votipka")[1] received a call from a man at the Callville Bay campground in the Lake Mead National Recreation Area ("Lake Mead").[2] The man (identified in testimony as the Reporting Party or "RP") told Votipka that there were only six or seven people camping and that he heard an incident between two other campers—a man and a woman. 06/16/21 Hearing Testimony ("06/16 Test.") at 10:23:46-10:23:50; 10:30:27-10:30:31; Gov't Ex. 2. The RP (i) provided his name and other identifying information, (ii) gave Dispatch the campground number in which he is staying (22), (iii) stated that the man had been on the phone

---

[1]     Votipka was credible at all times during her testimony.
[2]     The times on the Dash Cam and Dispatch recordings are reported in military time. The Court has converted all of these times to standard time for ease of review.

swearing, yelling, and screaming, (iv) explained a woman arrived yelling she was hurt and wanted to go to the hospital, (v) heard the woman repeatedly called the man "Mark," (vi) confirmed there was a physical altercation between the two people; (vii) stated the man said he had a gun, (viii) saw the man leave the campground in a dark colored Jeep Liberty and go left, and (ix) was unsure if the woman was with the man.  06/16 Test. 11:51:05-11:51:15; Gov't Ex. 2; *see also* Gov't Ex. 1, at 47 (Incident Detailed Report referred to in testimony as the "CAD")[3]; Gov't Ex. 3.  Votipka immediately dispatched a call to any available officer and at approximately 9:37 p.m. Ranger Romine ("Romine") responded first making him lead officer on the case.  Votipka gave Romine the information reported by the RP, confirmed it was possible that the female victim was in the car with the man, and contacted Ranger Fitch ("Fitch") as backup for Romine.[4]  Gov't Ex. 1 at 39, 47; Gov't Exs. 3, 8, 10, 12, 16, 18.[5]

Romine testified that, based on the information provided by Dispatch, he understood he was responding to an assault (a physical altercation) at Callville Bay campground, where a woman was screaming for help, a man said he was going to grab a gun, the man left the campground in a dark Jeep Liberty, and that it was unknown if the woman/victim was with the man who drove away.  06/16 Test. 12:47:24-12:47:30; 12:49:06-12:49:41, 12:56:36-12:56:42, 12:56:51-12:57:04; Gov't Ex. 3.[6] Romine lives approximately 400 yards from Callville Bay campground and confirmed there is one road going into and out of the campground (Callville Bay Access Road), that a person at campsite 22 could hear what was going on at campsite 18,[7] and that the Access Road connects to only one road (Northshore Road).  06/16 Test. 12:50:25-12:52:22, 1:04:15-1:04:46; Gov't Ex. 6.  Because

---

[3] There is no dispute that the entries in the Incident Report (Gov't. Ex. 1) were made approximately one to two minutes after Votipka received or made a call to officers responding to the December 6, 2020 event.
[4] The testimony by the Rangers was at all times credible.
[5] Fitch confirmed he heard the same report as Romine.  06/23/21 Hearing Testimony ("06/23 Test.") 1:50:57-1:51:31.  Fitch also radioed Dispatch as he was leaving the Ranger Station to confirm a description of the car he was looking for, and that the man driving the car had a gun.  *Id*. at 1:58:21-1:58:56; Gov't Ex. 14.  Fitch explained that officers need to know if they are pursuing a man reported to be leaving a scene of potential physical violence because this creates danger to the officers themselves.  06/23 Test. 1:59:02-1:59:18.
[6] Romine admitted that he was not told that the man had used the gun, there was blood or that the gun was at the campsite; and, he did not speak to the victim, assess her for injuries or speak to the RP or any other witnesses.  06/16 Test. 3:47:24-3:47:58.  Romine knew the victim and RP were different people and Romine called Ranger Thompson as backup to go to the campsite to assess the situation while he pursued the alleged perpetrator.  *Id*.
[7] Fitch confirmed his familiarity with Callville Bay campground and that a person at site 22 would hear people at site 18 shouting at each other.  06/23 Test. 1:54:29-1:54:50.

Romine knew the car left the campground and headed toward Northshore Road, he decided to proceed after the car turning on his Dash Cam Video Recorder (Gov't Ex. 4) at approximately 9:38 p.m. Gov't Ex. 9. Despite leaving the campground approximately 20 to 30 seconds after he heard the other car leave, and driving well over the speed limit (as much as 70-80 miles an hour), Romine did not catch up to the Jeep Liberty for over five minutes. Gov't Ex. 4 at 9:44 p.m.; 06/16 Test. 1:18:15-1:19; 1:21:43-1:43:56. Romine saw no other car on Callville Bay Access Road, and there were no other cars seen on Northshore Road. Romine confirmed that at this time (9:44 p.m.) he did not know if the victim was in the vehicle, whether she was in the vehicle against her will or if an assault was ongoing. 06/16 Test. 1:26:21-1:26:40.

Romine ran the Jeep Liberty's license plate through Dispatch, which came back clear and registered to Mark Galloway. Romine also waited for Fitch to catch up to him because, based on the severity of the reported crime, he would not make the stop alone. Romine did this for safety reasons, as confirmed by Fitch, because the person driving the car was reported to potentially have a gun, the person he was stopping could be armed and violent, the victim could still be in the car, and the victim was still in potential danger from the driver. 06/16 Test. 1:29:42-1:30:16; 06/23 Test. 2:01:43-2:02:18, 2:04:30-2:04:43. At 9:44 p.m., Romine reported he saw the car rock back and forth, with movement inside, suggesting potential furtive movements including someone reaching for or hiding something. Gov't Ex. 18; Ex. 1 at 39; 06/16 Test. 1:31:46-1:32:22. In total, Romine watched Galloway drive on Northshore Road for five to six minutes, observing, in addition to the rocking, Galloway's late reactions on corners, inconsistent speed, and the car moving back and forth from the fog line to the center line, leading Romine to believe Galloway was driving under the influence. 06/16 Test. 1:40:32-1:42:37, 1:50:13-1:50:42.[8]

At approximately 9:45:50, Romine and Fitch spoke and agreed to do a high risk stop. Gov't Ex. 19. Romine explained that his training and experience together with the totality of the information available (including, but not limited to, the reported physical assault and that Galloway

---

[8] Romine agreed on cross that Galloway touched, but did not cross the center line, cars speed up and slow down going up and down hills, and that Galloway took no evasive maneuvers to avoid Romine's pursuit. 06/16 Test. 3:50:40-3:51:37, 3:52:23-3:52:51, 3:56:49-3:56:54.

3

was getting or had a gun) suggested a high potential for violence and led to his decision that Galloway could be armed and dangerous. 06/16 Test. 1:43:29-1:45:33. Romine also explained, and Fitch confirmed, that the high risk stop decision was supported by Romine's observation that the car he followed was the same car Dispatch described—a dark colored Jeep Liberty that left Callville Bay campground after a reported assault with a man making threats referring to a gun. 06/16 Test. 1:50:52-1:51:33; 06/23 Test. 2:14:30-2:14:41.[9] It is uncontroverted that when this decision was made there was no information reported contradicting any of the information on which the Rangers decided to make a high risk stop. 06/16 Test. 1:45:34-1:45:44; Gov't Ex. 19 at 9:45:50 p.m. Approximately one minute later, Romine received confirmation from Dispatch that it was unknown if the victim was in the vehicle. Gov't. Ex. 20; 06/16 Test. 1:46:38-1:47:16. At 9:49 Romine and Fitch made the high risk stop. Gov't Ex. 22; 06/16 Test. 1:49:04-1:49:17.[10]

Romine activated his emergency lights at 9:49:50, and Galloway stopped almost immediately while Fitch's patrol vehicle blocked the other lane of traffic. Gov't Ex. 4; 06/16 Test. 1:52:20-1:52:45. The Rangers had weapons drawn and took cover because Galloway was reported to be leaving the scene of a violent crime, potentially armed with a weapon. 06/23 Test. 2:13:01-2:14:02, 2:16:18-2:16:33. The Dash Cam Video (Gov't Ex. 4) shows Romine told Galloway to put his hands out the window and open his car door with his left hand. Galloway did not comply and temporarily pulled his hands back into his car, while yelling about his seatbelt and screaming the f-word, causing Romine and Fitch further concern that Galloway might be reaching for a gun. Gov't Ex. 4. at 9:50-9:51 p.m.; 06/16 Test. 1:53:40-1:55:16; 06/23 Test. 2:17:52-2:18:52. As Galloway continued to yell expletives and not comply with Romine's commands, the Rangers became increasingly concerned that Galloway was under the influence. In the Rangers' experience, sober people do not behave as Galloway did. 06/16 Test. 1:55:50-156:17; 06/23 Test. 2:21:10-2:23:10; Ex. 4 at 9:50-9:53.

---

[9] Fitch explained that there are only two options when a car leaves Callville Bay campground, the man leaving was reported to go left, based on the direction the car was headed and timeline provided over the radio, he was confident he was encountering the car in which Galloway had left the campground. 06/23 Test. 2:09:06-2:09:47.

[10] Fitch confirmed that as of 9:49 p.m. he had no information suggesting anything other than Galloway was potentially armed, that the stop was high risk, and that he did not know the location of the victim. 6/23 Test. 2:07:28-2:07:34; Gov't Ex. 1 at 39.

4

As Galloway opened his car door and stepped out of his vehicle, Romine instructed Galloway to place his hands over his head and briefly lift his shirt at the waist so Romine could clear Galloway's waist band for weapons. 06/16 Test. 1:56:42-1:57:00; *see also* Gov't Ex. 4: at 9:50:50-9:51:32. Galloway briefly lifted and dropped his shirt, and then pulled his pajama bottoms and underwear down so that he was naked from the waist to his knees. *Id*. at 1:57:00-1:58:15; Gov't Ex. 4 at 9:51:21-9:51:31.[11] Romine testified that while at that point he did not believe Galloway had a weapon on him, Galloway was still aggravated, erratic, and non-compliant with commands. *Id*. at 1:58:24-1:58:34; 4:00:40-4:02:51; Gov't Ex. 4 at 9:50:15-9:51:31. In fact, Romine repeatedly instructed Galloway to turn around and walk backwards to the patrol vehicle, but Galloway did not comply and instead walked face forward to Romine's car. Gov't Ex. 4 at 9:51:17-9:51:37. Romine and Fitch explained this concerned them as Galloway's continued noncompliance further supported that Galloway was under the influence and potentially violent. 06/16 Test. 1:58:40-1:59:13; 06/23 Test. 2:21:10-2:23:10. As Galloway arrived at Romine's car, Romine stated once that if Galloway continued not to obey commands he could be tased. Gov't Ex. 4 at 9:51:37-9:51:40.

Galloway continued using expletives, continued not to obey commands, and challenged Romine stating he was pulled over for nothing. Gov't Ex. 4 at 9:51:41-9:52:49. Romine, who had his agency-issued AR-15 rifle trained on Galloway while speaking to him, and Fitch, who had his side arm drawn and pointed at Galloway, agreed that Fitch would frisk and handcuff (lay hands on) Galloway while Romine would keep his rifle in the low ready position, without his finger on the trigger, and with the safety on. *Id*. at 9:51:50-9:51:53; 06/16 Test. 4:04:02-4:05:17. Galloway remained non-compliant demanding to know "now" why he was stopped, waiving one arm as Fitch tried to place him in handcuffs, and then started yelling about his dog, using expletives, and claiming he did not have a gun. Gov't Ex. 4 at 9:51:55-9:52:21; *see also* 06/16 Test. 4:07:01-4:07:06.

The Rangers explained Galloway was handcuffed because all the information available regarding the reported crime did not eliminate the possibility that Galloway had a gun in his car, and when this was considered in light of Galloway's substantial erratic and noncompliant behavior after

---

[11] When Galloway pulled his pants and underwear down it was a "first" for Romine and, based on his training and experience, Romine would not expect a sober person to do the same. 06/16 Test. 4:28:32-4:29:11.

5

being stopped, they needed to control Galloway's movements in the open desert for officer and Galloway's safety. 06/16 Test. 1:58:50-2:04:39, 2:07:42-2:08:12; 06/23 Test. 2:26:03-2:26:43; 2:34:27-2:35:32, 2:36:39-2:36:47. Fitch patted Galloway down on his pant legs first because, as he explained, while Galloway did not have a gun on his body, there could be a gun in the pants or on his ankle. Gov't Ex. 4 at 9:52:27-9:52:33; 06/23 Test. 2:27:09-2:27:33, 2:29:45-2:29:53. As Galloway continued to yell about his dog, Romine approached the car and closed the car door. Gov't Ex. 4 at 9:52:40-9:52:59. As of 9:53:42 p.m. neither Ranger had a weapon pointed at Galloway, the weapons were put away, and neither Ranger drew a weapon again. 06/23 Test. 2:33:41-2:34:06.

As the Rangers moved Galloway to the patrol vehicle he continued challenging them, raising his voice, cursing, asking what he was being arrested for, yelling he does not have a gun in the car, and that he open carries for a "f__king living." Gov't Ex. 4 at 9:53:40-9:54:26. Romine told Galloway that he was not arrested but detained, while Romine also found Galloway's behavior continued to support that Galloway was under the influence. 06/16 Test. 2:10:16-2:10:26, 2:11:09-2:11:22.[12] Romine testified that as of 9:54:07 p.m. he still had no information about whether there was a gun in Galloway's car or where the victim was other than as reported by Galloway. 06/16 Test. 2:09:33-2:10:00; Ex. 23. Romine and Fitch placed Galloway in the back of Fitch's locked patrol car at approximately 9:55 p.m. Gov't Ex. 4.

The Rangers commenced their search of the car at 9:57 p.m. after speaking briefly to each other and to Dispatch. Romine testified that he and Fitch decided to search the car for a gun to: (1) determine if there is any basis for Galloway's threat that he was getting the gun, (2) potentially link Galloway to the gun in the event it was used in an assault, and (3) alleviate the safety concern that Galloway, suspected of driving under the influence, could return to the car with access to a gun. 06/16 Test. 2:15:47-2:17:05. Romine admitted that he did not have concerns for his personal safety when he commenced the search. *Id.* at 2:17:06-2:17:24.

The search yielded an open container of Fireball and a small amount of marijuana. Gov't Ex. 4 at 9:55-10:04:13. The Rangers testified that, in addition to the totality of Galloway's behavior

---

[12] Fitch testified that the process he followed with Galloway—handcuffing, pat-down, and placing him in the back of a patrol vehicle—is the same process he follows when arresting a suspect. *Id.* at 3:18:31-3:18:45.

6

leading up to the search, finding an open, less than full, container of Fireball on the front seat added to the suspicion that a second crime had been committed and that they had probable cause to arrest Galloway for a DUI. 06/16 Test. 2:20:10-2:20:37; 06/23 Test. 2:39:30-2:41:12. However, Romine confirmed that he had probable cause to believe Galloway was driving under the influence before he began to search Galloway's car based on all the information available including Galloway's driving behavior, demeanor, attitude, pulling his pants down, cursing, screaming, and general agitation. *Id*. at 4:32:22-4:33:38.

At approximately 9:57 and 9:59 p.m. Romine received radio calls from Ranger Thompson. The 9:57 call indicated there was no real firearm, but a fake one at the campsite. Gov't Ex. 1 at 39; Gov't Ex. 26; 06/16 Test. 2:43:09-2:43:38. The 9:59 call reported that Mrs. Galloway said there was no physical altercation. Gov't Ex. 1 at 39; Gov't Ex. 27; 06/16 Test. 2:46:46-2:46:58. However, it is undisputed that the Rangers began the search of Galloway's car before Thompson's interview with the alleged victim of assault began (06/16 Test. 2:43:09-2:43:38; 2:55:18-2:55:32). The Rangers continued the search because they believed a gun could still be in the car (having already found 40 caliber magazines), the victim's report regarding a toy gun might not be the truth, the victim might not know if Galloway had a gun, and because the Rangers were continuing an investigation into a DUI. 06/16 Test. 2:53:13-2:54:00.[13] The search took approximately seven minutes. Gov't Ex. 4 at 9:57-10:04 p.m.

At approximately 10:07, Romine approached Galloway in the back of Fitch's patrol vehicle and, standing just a few inches from him, detected an odor of alcohol and slurred speech when Galloway spoke.[14] *Id*. at 3:01:42-3:02:16, 4:22:36-4:22:40; *see also* Gov't Ex. 4. at 10:07:23-10:08:20. Fitch, who also stood close to Galloway, smelled alcohol and noticed Galloway's speech was slurred as well. 06/23 Test. 2:53:41-2:54:07. After being *Mirandized*,[15] Galloway unsolicited

---

[13] Romine testified that he received domestic violence training during his tenure as a law enforcement officer and has experience responding to more than 20 domestic violence calls demonstrating that domestic violence calls are among the most dangerous calls to which he responds and that, in such situations, victims and aggressors "almost never" tell the truth. 06/16 Test. 4:29:24-4:30:19, 4:30:31-4:31:11, 4:31:20-4:31:35.

[14] Romine confirmed that because they were outside and Galloway wore a mask before he was placed in Fitch's patrol vehicle, he did not smell alcohol on Galloway's breath until he spoke with Galloway while Galloway was only inches away from him in Fitch's patrol car. *Id*. at 4:34:22-4:34:38.

[15] Galloway was *Mirandized* at approximately 10:08:19. He confirmed he understood his right at 10:08:50. Gov't. Ex. 4.

told Romine that he knew there was an open container in his car, and that he had been drinking at the campsite. 06/16 Test. 3:03:15-3:04:14.

Romine and Galloway then spoke for several minutes during which time Romine was calm and conversational. Gov't Ex. 4 at 10:08:50-10:12:15. Neither Romine nor Fitch had weapons drawn, there were no threats of arrest or obtaining a warrant, and no other verbal or nonverbal threats that related to whether Galloway was willing to take a field sobriety test.[16] 06/23 Test. 2:55:46-2:57:18. Romine and Galloway engaged in the following exchange:

| | | |
|---|---|---|
| Romine: | | Let's try this. Would you be willing to run a couple of tests? |
| Galloway: | | No, I would rather do a breath test. |
| Romine: | | You want to do take a breath test? |
| Galloway: | | No, I don't know. What's easier? Please, I don't want—please don't do this to me man. |
| Romine: | | Ok. I mean—it is your choice. I can't make you do either. |
| Galloway: | | Neither. I don't want to do none. |
| Romine: | | So … you don't want to do either? |
| Galloway: | | Wait. I don't … I am not refusing. I don't want to be arrested either. |
| Romine: | | Ok. Do you want to do a breath test? Want to do a blood test? I can do a blood test. Blood or breath if you want to do either. |
| Galloway: | | Walk, maybe? |
| Romine: | | Blood or breath. I mean it is up to you if you want to consent to either. |
| Galloway: | | … Walking. |
| Romine: | | You want to do the test? |
| Galloway: | | I guess. |
| Romine: | | Okay. |

Gov't Ex. 4 at 10:12:46-10:13:22.[17]

---

[16] Romine's statement to Galloway that Galloway could be tased if he continued not to follow commands occurred 21 minutes before the two discussed a field sobriety test. *Compare* Gov't Ex. 4 at 9:51 *and* 10:12.

[17] Romine explained at the beginning of his testimony that he has substantial experience with DUI stops, as well as training in field sobriety testing. 06/16 Test. 12:40:49-12:41:40, 12:42:41-12:43:05.

8

At approximately 10:14, Galloway stepped out of the patrol car and the handcuffs were removed to conduct the field sobriety test.[18] The entire test was cordial, with Romine describing what Galloway needed to do and demonstrating as needed to ensure Galloway understood his instructions. *Id*. at 3:19:59-3:20:32; Ex. 4. at 10:16:50-10:25:57. In fact, during the middle of the testing process, Romine ensured Galloway wanted to continue after Galloway told Romine that he suffers from scoliosis. 06/16 Test. 3:27:27-3:27:50. This type of exchange occurred at least twice more, and it is clear that at no time did Galloway refuse to continue or ask not to continue the test. *Id*. at 3:28:13-3:28:38; 3:29:56-3:30:26; 3:33:41-3:34:14. However, when Romine obtained a Breathalyzer from his patrol car, Galloway decided not to proceed further, whined that he had done well, that it was "not fair," and asked if he was going to be arrested. *Id*. at 3:36:29-3:36:43; Gov't Ex. 4 at 10:24:30-10:25:59. Romine did not respond to these questions, but soon thereafter Galloway was arrested for driving under the influence. *Id*. Romine stated, and Fitch concurred, that the outcome of the field sobriety test confirmed probable cause that Galloway was driving under the influence. *Id*. at 3:35:29-3:36:15; 06/23 Test. 3:00:39-3:00:50.

On December 7, 2020, a complaint was filed against Mark Galloway alleging four Class B Misdemeanors: (1) Operating a Motor Vehicle while Under the Influence of Alcohol (36 C.F.R. § 4.23(a)(1)), (2) Operating a Motor Vehicle with a BAC of 0.08 Grams and Higher (36 C.F.R. § 4.23(a)(2)), (3) Open Container of Alcoholic Beverage (36 C.F.R. § 4.14(b)), and (4) Disorderly Conduct (36 C.F.R. § 2.34(a)(2)). Counts three and four were dismissed on June 16, 2021. The Court discusses counts one and two only.

**II.    Discussion**

   A.    <u>Brief overview of applicable law</u>.

The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...."[19] Evidence resulting from an unconstitutional search or seizure is inadmissible, and therefore must be suppressed.[20]

---

[18]    Galloway was detained in Fitch's car for 20 minutes from 9:54 p.m. to 10:14 p.m. *Id*. at 3:16:00-3:16:24.
[19]    U.S. CONST. amend. IV.
[20]    *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

There are "two categories of police seizures."[21] A *Terry* stop is an investigatory stop, which must be supported by reasonable suspicion that criminal activity "may be afoot."[22] In contrast, an arrest must be supported by probable cause.[23] To determine whether there is reasonable suspicion to support a *Terry* stop, the Court must consider if "in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"[24] Probable cause for an arrest is a more exacting standard, requiring that the arresting officers "have reasonably trustworthy information sufficient to lead" a prudent person to conclude that the accused committed an offense.[25]

"There is no bright-line rule to determine when an investigatory stop becomes an arrest."[26] To make this determination, courts must consider the "totality of the circumstances," which is a case specific inquiry.[27] Courts generally consider the totality standard based on the "intrusiveness of the stop, i.e. the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, … and the justification for the use of such tactics, *i.e.* whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken."[28] "[W]hether … police action constitutes a *Terry* stop or an arrest" is based on "evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*."[29] Cooperativeness and reasonable belief that there is a threat to police officer safety are two considerations the Ninth Circuit points to noting the determination is "always one of reasonableness under the circumstances."[30]

Recognizing that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention," the Court considers the facts in this case in light of four questions

---

[21] *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995).
[22] *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Terry v. Ohio*, 392 U.S. 1 (1968).
[23] *Allen*, 73 F.3d at 236 (citing *Henry v. United States*, 361 U.S. 98, 1002 (1959)).
[24] *United States v. Alvarez*, 455 F.Supp.3d 976, 983-84 (D. Nev. 2020) *citing U.S. v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011).
[25] *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citation omitted).
[26] *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (internal citation omitted).
[27] *Id*. (internal citation omitted).
[28] *Id*. (internal citation omitted).
[29] *Id*. (internal citation omitted).
[30] *Id*. (internal citations omitted).

identified in *Lambert*.[31] First, was the suspect "uncooperative" or did he take action at the time of the stop that raised "a reasonable possibility of danger or flight?"[32] Second, did the Rangers have information that the suspect was armed?[33] Third, did the stop closely follow a violent crime?[34] Fourth, did the Rangers "have information that a crime that may involve violence is about to occur?"[35] Ultimately, whether Galloway was arrested or detained when placed in Fitch's patrol car is important because if Galloway was arrested, rather than detained, the Rangers must have had probable cause to do so.

Further, because the collective knowledge doctrine was raised during the evidentiary hearing, the Court notes that when determining whether an investigatory stop, search or arrest complied with the Fourth Amendment it may "look to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action]."[36] Importantly, however, even if some officers had a mistaken but reasonable belief as to facts in support of the question of probable cause, they are not in violation of the Constitution.[37] "[W]hat is generally demanded of the many factual determinations that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable."[38]

    B.    <u>The Rangers had reasonable suspicion to conduct a *Terry* stop of Galloway's car</u>.

When Romine turned on his lights and siren, the Rangers had a particularized and objective basis for suspecting Galloway of wrongdoing. The Rangers reasonably believed there was a reliable call from an individual at Callville Bay campground, close enough to Galloway's campsite to hear yelling, cursing, an alleged altercation between Galloway and a woman, the woman yelling she was

---

[31] *Id.* at 1189.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (alteration in original) (quoting *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986)).
[37] *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).
[38] *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990). *See also, e.g., United States v. Garcia–Acuna*, 175 F.3d 1143, 1147 (9th Cir.1999); *United States v. Hatley*, 15 F.3d 856, 859 (9th Cir. 1994).

hurt, and the man saying he had or was getting a gun. The Rangers also knew that a man named Mark drove away from the campsite in a dark colored Jeep Liberty, that Mark Galloway was the registered owner of the Jeep Liberty Romine followed, and it was unknown if the woman/victim was in the car. Romine followed the Jeep Liberty for more than five minutes and saw it rock back and forth suggesting an occupant was hiding or grabbing something. The driver could not maintain consistent speed, and the car repeatedly drifted from the fog to the center line of the road. Based on the foregoing, when the Rangers stopped Galloway's car, the totality of the facts establish reasonable suspicion that the person driving had engaged in criminal activity.[39]

        C.      <u>Under the totality of the circumstances, Galloway was not arrested</u>.

                *i.*      *The Rangers use of weapons was reasonable*.

There is no dispute that when Romine and Fitch stopped Galloway, with guns drawn, the stop was intrusive, and Galloway was not free to leave after brief questioning. However, the initial stop was an investigatory one, supported by reasonable suspicion, and Galloway's inability to leave the scene does not change the outcome of this analysis.[40]

Irrespective of the exact wording Votipka used when speaking with Romine (Galloway had a gun or was going to get a gun), there is no dispute that at the time the Rangers stopped Galloway there was credible information from the 911 call regarding what the RP heard, (yelling, screaming, swearing, a woman saying she was hurt and wanted to go to the hospital, and a man saying he had or was getting a gun), what he believed (there was an altercation between the man and the woman), what he saw (the man leave the scene in a dark colored Jeep Liberty), and what he did not know (whether the victim was in the car with the man).[41] Romine testified, and the Dash Cam Video confirmed, that Romine followed the dark colored Jeep Liberty for over five minutes on a dark road during which time no other car is seen, and that he reported, among other observations, that the Jeep Liberty rocked back and forth indicating someone in the car was reaching for or hiding something. The lack of actual knowledge whether Galloway was armed does not change the outcome of this

---

[39]    *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (*citing Terry*, 392 U.S. at 30).
[40]    *Ornelas v. United States*, 517 U.S. 690, 693 (1996) (internal citations omitted).
[41]    A call to a 911 emergency number is an "indicator of veracity." *United States v. Johnson*, Case No. 18-cr-00031-JSW, 2018 WL 2763327, at *7 (N.D. Cal. June 8, 2018) (*citing Navarette v. California*, __ U.S. __ 134 S.Ct. 1683, 1689 (2014).

analysis.[42]  Further, Romine and Fitch did not know whether the violence had concluded because they did not know if the alleged victim—Galloway's wife—was in the car.

In *United States v. Martinez*, the Ninth Circuit discussed "the combustible nature of domestic disputes," stating:

> When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning.  … Indeed, more officers are killed of injury on domestic violence calls than any other type of call.  Hearings before Senate Judiciary Committee, 1994 WL 530624 (F.D.C.H.)….[43]

The U.S. Supreme Court also recognizes the inherent and heightened danger to law enforcement when responding to alleged domestic violence.  "Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim."[44]

Romine and Fitch reasonably believed they were facing a potentially violent and combustible situation when they stopped the dark colored Jeep Liberty Galloway was driving on the night of December 6, 2020.[45]  It is true that the Rangers were not told shots were fired at the campsite and that Galloway did not take evasive measures to get away from the Rangers.  However, these facts do not overcome the Rangers' reasonable and legitimate concerns for their safety.  Based on their collective training and experience, the Rangers knew that responding to an alleged crime involving a weapon and potential domestic violence was high risk for law enforcement especially when (1) Galloway could be armed, dangerous, and under the influence, (2) the victim was potentially inside the car, and (3) Galloway had already allegedly committed a violent crime.[46]

Given the specific circumstances of this case, the Court finds the level of intrusiveness at the time of the stop was reasonable.[47]

---

[42]   *U.S. v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001).
[43]   406 F.3d 1160, 1164 (9th Cir, 2005) (internal quotation marks and some citations omitted).
[44]   *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 186 (2004).
[45]   *Lambert*, 98 F.3d at 1186-87; *see also United States v. Galindo*, Case No. 2:19-cr-00215-APG-BNW, 2020 WL 5881821, at *12 (D. Nev. Aug. 5. 2020) (internal citations omitted) (confirming that information that a suspect is potentially armed and dangerous may justify more intrusive measures during a *Terry* stop).
[46]   *Lambert*, 98 F.3d at 1187; *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995).
[47]   The stop, as stated above, occurred at 9:50 p.m.  Less than four minutes later Romine and Fitch no longer had weapons drawn.  6/23 Test. 2:33:41-2:34:06.  It is uncontested that neither Ranger ever drew their weapon again.

        *ii.      Handcuffs and placing Galloway in Fitch's patrol car was justified.*[48]

Looking to the four questions asked in *Lambert* (*supra* at 11), the use of handcuffs and placing Galloway in the locked patrol car was justified and did not turn Galloway's detention into an arrest.

- First, Galloway was uncooperative when stopped.[49] Galloway behaved, at best, erratically, yelling and cursing, arguing and demanding information, repeatedly refusing to follow simple commands, and pulling his pants and underwear down to his knees to stand naked for a moment on the road.[50] Galloway did not turn around as instructed and walked face forward to the front of Romine's car in contravention of repeated commands, causing Romine to tell Galloway once that if he continued to ignore commands he would be tased. Of course, even after Romine made this statement, Galloway's lack of cooperation continued.[51] This behavior supports the reasonable conclusion that Galloway was a potential danger to the Rangers and that, despite protestations to the contrary, could have a gun in his car.

- Second, Galloway was handcuffed only following a credible report of an alleged domestic altercation in which he was the reported aggressor who was going to get a gun.[52] It is this exact type of circumstance that portends danger and renders reasonable the decision to handcuff a suspect.[53]

- Third, the stop closely followed the report of a violent crime—a physical assault by a man of a woman at the campsite.

- Fourth, while there was no additional crime about to occur, the Rangers were entitled to consider Galloway's erratic and noncompliant behavior, the specific information that Galloway was the person being sought, there were only two officers present, at night, in the desert, with little to no light available, and if Galloway attempted to flee he could be injured.[54]

As stated in *Lambert*, "pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not *automatically* convert an investigatory stop into an arrest that requires probable cause."[55] The Rangers had to make an "on-the-spot" decision, which they did based on Galloway's uncooperative and agitated demeanor, that he potentially had a gun in the car, and the patrol car was the only reasonable place to detain him.

---

[48]     Neither Defendant's Motion to Suppress nor his Reply challenge Galloway's pat down. ECF Nos. 17 and 26. Defendant also does not raise this issue in his closing argument. 6/23 Test. (Defendant's closing) at 4:01:34-4:02:08.
[49]     98 F.3d at 1189; *see* Gov't Ex. 4 at 9:50-9:53:59.
[50]     Gov't Ex. 4 at 9:50-9:53:59.
[51]     *Id*.
[52]     At the time he was handcuffed Romine and Fitch had received no information from Thompson at the campsite contradicting the report of an altercation. *Compare* Gov't Ex. 4 at 9:54 *and id*. at 9:57 and 9:59.
[53]     *Lambert*, 98 F.3d at 1189-90.
[54]     *Lambert*, 98 F.3d at 89-90 (internal citations omitted); *see also* 06/16 Test. 2:07:42-2:08:12; 06/23 Test. 2:34:27-2:35:32, 2:36:39-2:36:47.
[55]     *Lambert,* 98 F.3d at 1186 (emphasis in original).

14

Galloway was found in the location it was anticipated he would be found, could have been armed, and had allegedly just committed a violent crime.[56]

In sum, and based on all the information available at the time Galloway was handcuffed and placed in the back of Fitch's patrol car, the Rangers' decision to limit Galloway's freedom was justified.[57] The facts of this case demonstrate Galloway was detained, not arrested.

### D. The government concedes the search of Galloway's car was impermissible and therefore will not admit evidence found in the search in its case in chief.

In the government's response to Galloway's Motion to Suppress, it states that the search of Galloway's car was improperly executed and, ultimately, Count III of the Complaint was dismissed. ECF No. 22 at 1 n.1. The Government further concedes that "it will not admit the evidence resulting from the search of Galloway's vehicle in its case in chief." *Id*. at 3 n.2. These representations obviate the need to decide whether there was probable cause to search Galloway's car or to suppress any evidence found during the search as the government agrees to suppression.

### E. The length of Galloway's detention was not impermissible under the circumstances.

There is no "rigid time limitation on *Terry* stops."[58] "If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief period involved in *Terry*."[59] The Court must "take care to consider whether the police [we]re acting in a swiftly developing situation" and "should not indulge in unrealistic second-guessing" of the Rangers' actions.[60] The purpose of this *Terry* stop was to investigate violent criminal activity that included a potential DUI.

Romine and Fitch stopped Galloway at approximately 9:50, had him out of his car, patted him down, and in the back of Fitch's patrol car at approximately 9:55 p.m. Gov't Ex. 4. While Galloway continued to argue with and demand information from the Rangers, Romine reported the detention to Dispatch, and the Rangers had a brief conversation regarding the search of the car.

---

[56] *United States v. Edwards*, 761 F.3d 977, 982 (9th Cir. 2014).
[57] *Compare United States v. Alvarez*, 899 F.2d 833 (9th Cir. 1990) *and Galindo*, 2020 WL 5881821.
[58] *Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985).
[59] *Id*. citing *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981).
[60] *Sharpe*, 470 U.S. at 686 (brackets in original).

1  There was no delay in the Rangers' conduct as they had diligently pursed their investigation
2  throughout this time.
3     The Rangers' search of Galloway's car took approximately seven minutes and was based on
4  their objective and reasonable, albeit mistaken, belief that they had probable cause to do so.[61] That
5  is, the objective evidence shows that, even extricating all information pertaining to a gun and the
6  government's concession that there was an impermissible search for a gun, there are substantial
7  independent facts establishing support for the Rangers mistaken, but reasonable belief they could
8  search Galloway's vehicle for evidence of a DUI.[62]  The "Court need not decide whether this
9  evidence constitutes probable cause for execution of the search …[;] it is enough if … [the Rangers]
10 reasonably (even if mistakenly) believed that the search … was justified."[63]  What was demanded
11 of these Rangers, was not that they were correct, but that they were reasonable."[64]  Moreover, unlike
12 the decision by the Ninth Circuit in *Lopez-Soto*, finding that the Rangers had a mistaken view of the
13 legal right to search will not defeat the purpose of the exclusionary rule as evidence arising from the
14 conceded impermissible search is excluded.[65]
15    Romine's observation of Galloway's driving (including inconsistent speed, the car rocking
16 back and forth, and the car's repeated movement from the fog line to center line) provided the initial
17 basis to believe Galloway was driving under the influence.  Next, as discussed above, there was
18 reasonable suspicion to conduct an investigatory stop at the outset based on the report from Dispatch.
19 Thereafter, evidence of Galloway's intoxication grew immeasurably as he interacted with the
20 Rangers.  As Romine aptly stated, and a review of the Dash Cam Video shows, sober people do not
21 pull their pants and underwear down to stand naked in front of law enforcement.[66]  And, sober people

---

[61] Neither party addresses the issue of whether the Rangers' search was based on a mistaken, but reasonable belief and therefore did not unlawfully prolong Galloway's detention.  The government skips this issue; whereas, Defendant concludes Galloway was arrested and therefore always impermissibly detained.  The government does cite to *Lingo v. City of Salem*, 832, F.3d 953 (9th Cir. 2016) for the proposition that "evidence obtained from an illegal search may still provide probable cause for an arrest."  ECF No. 22 at 7 n.4.  The Court need not reach the issue presented by *Lingo* because the evidence found in Galloway's car is not considered by the Court.
[62] *Illinois*, 462 U.S. at 238; *Rodriguez*, 869 F.2d at 484.  Had the government not conceded the Rangers lacked probable cause to search of Galloway's car for evidence of a DUI, the Court would likely have found this search lawful.
[63] See *Sanders v. State of Arizona*, Case No. 4:15-cv-00535-TUC-JAS, 2016 WL 7732541, at *3 (D. Ariz. Sept. 21, 2016) (internal citation omitted).
[64] *Illinois v. Rodriguez*, 497 U.S. at 185.
[65] *U.S. v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000).
[66] 06/16 Test. 140:30-142:42; 1:55:43-156:24; 2:11:09-2:11:22.

16

do not behave in the erratic, agitated, and confrontational manner Galloway did.[67] All of these events occurred before the Rangers commenced their search of Galloway's car for evidence of a DUI and supported the Rangers' objective reasonable belief they could do so.

Because the search of Galloway's car for evidence of a DUI did not violate the Fourth Amendment, Galloway's detention during that search also did not result in a violation of his constitutional rights.[68]

      F.    <u>There was reasonable suspicion to conduct the field sobriety test.</u>

Once the search was completed, Romine *Mirandized* Galloway and briefly questioned him regarding what occurred at the campsite and how much he had to drink (*id*. at 10:07-10:14), after which Galloway was removed from the patrol car and handcuffs were taken off so that the Rangers could conduct the field sobriety test. *Id*. at 10:14. The Rangers only needed reasonable suspicion that a driver is under the influence to conduct a field sobriety test,[69] which the Rangers clearly had based on Galloway's driving and conduct once stopped.[70] Further, even if Galloway's consent was required, the evidence shows that *Miranda* warnings were given, no officer had a gun drawn, Galloway was told he could refuse the test, and Galloway was not told a search warrant would be obtained if he refused.[71] *Id*. The touchstone to whether consent was voluntary is whether it was the result of duress or coercion.[72] To this end, Galloway points to Romine's single statement that

---

[67] Galloway had a mask on at all times before he was detained in the back of Fitch's patrol car; hence, neither Ranger testified they smelled alcohol on his breath prior to commencing the search. *Id*. at 4:32:22-4:34:42.

[68] *See*, for example, *Rivera v. City of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014) (holding that an arrest flowing from a mistaken belief regarding the identity of the individual arrested does not violate the Fourth Amendment.); *accord Hill v. California*, 401 U.S. 797, 802 (1971) ("[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." (internal quotation marks omitted)); *Thompson v. Olson,* 798 F.2d 552, 556 (1st Cir. 1986) ("[A] police officer's initial finding of probable cause justifies not only arrest, but a reasonable period of continued detention for the purpose of bringing the arrestee before a magistrate. Generally, once the arrest has been properly effected, it is the *magistrate* and not the policeman who should decide whether probable cause has dissipated to such an extent following arrest that the suspect should be released.... [H]aving once determined that there is probable cause to arrest, an officer should not be required to reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of the squad car.") (Emphasis in original.)

[69] *U.S. v. French*, Case No. 2:08-mj-GFW, 2010 WL 1633456, at *3 (numerous internal citations omitted).

[70] Under NRS 484C.160 (formerly 484.383), drivers are deemed to consent to a field sobriety test when officers administering the test have reasonable suspicion to believe the person being tested was driving under the influence. This law is incorporated by and applies within national parks under 36 C.F.R. § 4.2 ("Unless specifically addressed by regulations in this chapter, traffic and the use of vehicles within a park are governed by State Law.").

[71] *United States v Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (internal citation omitted).

[72] *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

17

Galloway could be tased if he continued not to follow officer commands. However, this statement was made at 9:51 p.m., while the exchange between Romine and Galloway regarding the field sobriety test started at 10:12 p.m., 21 minutes later. This belies coercion or duress, as does the tone of the entire interaction surrounding the commencement and subsequent performance of the test. In fact, Galloway was given the opportunity to cease the test on multiple occasions. And, the Rangers had holstered or put away their weapons by 9:53 p.m., 19 minutes before the exchange regarding the field sobriety test occurred. The totality of these circumstances, together with the actual exchange between Romine and Galloway in which Romine states he cannot make Galloway participate in the test, demonstrate Galloway voluntarily consented to the test.[73]

### III.   Order

Accordingly, and based on the foregoing, IT IS HEREBY ORDERED that Defendant's Motion to Suppress (ECF No. 17) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Defendant's Motion to Suppress is granted as it pertains to the search of Defendant's car and the suppression of any evidence found during that search.

IT IS FURTHER ORDERED that Defendant's Motion to Suppress is otherwise denied.

Dated this 4th day of August, 2021

_____
ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

---

[73] Defendant does not take issue with the outcome found, which demonstrated Galloway was under the influence while driving. ECF No. 17 at 15; 26 at 9-10.